TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00024-CV







Southwestern Public Service Company/Public Utility Commission of Texas and

City of Amarillo, Appellants


v.


Public Utility Commission of Texas, City of Amarillo, ASARCO, Inc., and Texas Industrial
Energy Consumers/Southwestern Public Service Company, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. 96-06109, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING 






 The Public Utility Commission of Texas (the Commission) refused to allow Southwestern
Public Service Company (Southwestern), a utility company, to recover certain fuel costs from its customers
and required it to reimburse its opponent, the City of Amarillo, for costs the City incurred participating in
the proceeding. Southwestern sought judicial review of the order in district court. The district court
affirmed the order for the most part, but reversed the order on two points of law. Consequently, all three
parties appeal the district court's judgment. (1) We will affirm the district court's judgment in part and reverse
and render in part.

THE CONTROVERSY

 The Public Utility Regulatory Act of 1995 (2) (PURA 1995) allows utility companies to seek
periodic review to reconcile their fuel expenses when their predetermined customer rates result in either
over- or under-recovery for fuel expenses. See PURA 1995 §§ 2.051(cc), 2.212(g); (3) see also 16 Tex.
Admin. Code § 23.23(b)(3) (1997). The administrative vehicle used to accomplish this result is called a
fuel reconciliation proceeding. A utility must file a petition with the Commission to institute a fuel
reconciliation proceeding. See 16 Tex. Admin. Code § 23.23(b)(3). 

 Southwestern petitioned the Commission to reconcile its fuel expenses incurred between
January 1, 1992 and December 31, 1994. The City of Amarillo, among others, opposed Southwestern's
petition. An administrative law judge (ALJ) from the State Office of Administrative Hearings (SOAH)
conducted an evidentiary hearing. Two issues at the hearing were: (1) the prudence of Southwestern's
choice of fuel during the reconciliation period, and (2) the accuracy of Southwestern's accounting for fuel
costs during that time period. The ALJ proposed a decision that Southwestern had met its burden of proof
on both issues. The Commission later rejected the ALJ's findings and conclusions on both issues and
adopted a final order containing findings and conclusions contrary to the ALJ's on those issues. 
Furthermore, the Commission required Southwestern to reimburse the City for the reasonable expenses
the City incurred participating in the fuel reconciliation proceeding.

 Southwestern filed a motion for rehearing arguing that the Commission erred in substituting
its judgment for the ALJ's on the fact issues. Southwestern cited Texas Government Code section
2003.049(g) as authority for this proposition. (4) The statute reads:


[T]he commission may change a finding of fact or conclusion of law made by the
administrative law judge or vacate or modify an order issued by the administrative law
judge only if the commission: 


(1) determines that the administrative law judge:


 (A) did not properly apply or interpret applicable law, commission rules or policies,
or prior administrative decisions; or


 (B) issued a finding of fact that is not supported by a preponderance of the
evidence; or


(2) determines that a commission policy or a prior administrative decision on which the
administrative law judge relied is incorrect or should be changed.


See Tex. Gov't Code Ann. § 2003.049(g) (West 1998). On rehearing, the Commission issued an order
concluding that the statute did not apply and reiterating the other aspects of its previous order.

 Southwestern sought judicial review in district court. See PURA 1995 § 1.301; (5) Tex.
Gov't Code Ann. § 2001.171 (West 1998). The district court reversed the Commission's order in two
respects. First, the court ruled the Commission erred in requiring Southwestern to reimburse the City for
its costs. Second, the court ruled the Commission erred in concluding section 2003.049(g) did not apply
to the administrative proceeding. The court affirmed the order in all other respects, implicitly finding that
the Commission had met the requisites of section 2003.049(g) even though the Commission did not
consider it applicable.

 The Commission and the City each appeal the district court's decision in one point of error,
contending the court erred in denying the City reimbursement for its costs. Southwestern appeals the
district court's decision in a single point of error, arguing the court erred in affirming the Commission's
substitution of its own findings of fact for the ALJ's findings. We will address Southwestern's point first.


DISCUSSION

I. Southwestern's Appeal

 Southwestern's point of error has three components. Southwestern first argues section
2003.049(g) applies to this proceeding. Second, Southwestern contends the Commission violated the
statute by substituting its judgment for the ALJ's on questions of fact. According to Southwestern, had the
Commission properly applied section 2003.049(g), it would have affirmed the ALJ's proposal because the
evidence supported the proposal. Finally, Southwestern argues the district court applied an incorrect scope
of review in determining whether the Commission properly applied section 2003.049(g).


A. Applicability of Section 2003.049(g) (6)

 Before September 1, 1995, the Commission heard all its own contested cases and had
the discretion to delegate initial fact-finding and decision-making authority to hearing examiners employed
by the agency. See Act of May 26, 1991, 72d Leg., R.S., ch. 847, § 1, 1991 Tex. Gen. Laws 2917
(formerly Tex. Rev. Civ. Stat. Ann. art. 1446c, § 16(h)). Effective September 1, 1995, the legislature
created the utility division of SOAH, an independent state agency, and transferred Commission hearing
examiners to the employ of SOAH. See Act of May 27, 1995, 74th Leg., R.S., ch. 765, § 1.37, 1995
Tex. Gen. Laws 3972, 3987 (not codified). In so doing, the legislature did not divest the Commission of
the power to conduct its own hearings. See PURA 1995 § 1.101(e). Commission members may still
conduct their own evidentiary hearings, but in the event they choose to delegate their authority, they must
delegate it to the ALJs in the utility division of SOAH. Id.

 The legislation transferring the Commission's hearings examiners to the utility division of
SOAH also added section 2003.049(g), the above-quoted statute that concerns Commission review of
ALJ findings and conclusions. See Act of May 27, 1995, 74th Leg., R.S., ch. 765, § 1.35, 1995 Tex.
Gen. Laws 3972, 3986. The legislation provided:


[C]hanges in law made by [this legislation] that relate to the procedures governing a hearing
before the utility division of the State Office of Administrative Hearings apply only to a case
that is filed on or after September 1, 1995. In addition, the procedures prescribed by the
provisions amended by [this legislation] shall continue to be used in a hearing as those
provisions existed on August 31, 1995. The former law is continued in effect for those
purposes.


Id. (not codified).

 The Commission argues this saving clause renders section 2003.049(g) inapplicable to
cases filed before September 1, 1995, including this case. Southwestern, on the other hand, argues the
saving clause does not concern section 2003.049(g) and that 2003.049(g) applies to all cases heard by
SOAH, even those instituted at the Commission before September 1, 1995. The applicability and
interpretation of this statute is a question of law and we may decide the issue de novo. See In re
Humphreys, 880 S.W.2d 402, 404 (Tex. 1993); see also Firemen's Pension Comm'n v. Jones, 939
S.W.2d 730, 733, 735 (Tex. App.--Austin 1997, no writ) (court did not defer to agency's interpretation
of saving clause).

 We agree with Southwestern. The saving clause pertains to changes in the law that are
procedural and that relate to hearings before the utility division of SOAH. Section 2003.049(g) is not a
procedural section and it does not pertain to hearings before SOAH. It concerns the substantive powers
of the Commission and relates to proceedings that take place after SOAH hearings. We, therefore, hold
that section 2003.049(g) applies to this case. The trial court properly reversed the Commission's order
on this issue.


B. Commission Review of Proposal for Decision under Section 2003.049(g)

 Southwestern next contends the creation of the utility division at SOAH and the enactment
of section 2003.049(g) severely restrict the Commission's power to determine factual issues first addressed
by an ALJ at SOAH. According to Southwestern, the Legislature created SOAH to bifurcate
administrative proceedings and severely restrict agencies' power to decide disputed issues of fact and law. 
For support, Southwestern cites a provision in the APA that generally restricts agencies' power to change
findings of fact and conclusions of law in proposals for decision. See Tex. Gov't Code Ann. § 2001.058(e)
(West 1998). (7)
 Southwestern also cites several legal commentaries discussing that provision.

 The legislature may have had that purpose in mind when it enacted APA section 2001.058. 
The legislature clearly expressed a different intent, however, for Commission proceedings. Section
2003.049(g), a statute applicable only to Commission proceedings, expressly supercedes APA section
2001.058. Tex. Gov't Code Ann. § 2003.049(g). Consequently, the language of section 2001.058 and
the authorities discussing it are not relevant to the proper interpretation of section 2003.049(g).

 The part of section 2003.049(g) at issue in this case is subsection (1)(B), which allows the
Commission to change an ALJ's finding of fact if the Commission determines it "is not supported by a
preponderance of the evidence." Southwestern urges us to interpret this provision as restricting the
Commission's review of an ALJ's fact-finding to a deferential, appellate type of review. We do not read
section 2003.049(g) as requiring the Commission to defer to an ALJ's findings. 


 

Act of April 30, 1993, 73d Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 741 (Tex. Gov't Code
Ann. § 2001.058(e), since amended). It now reads:


A state agency may change a finding of fact or conclusion of law made by the
administrative law judge, or may vacate or modify an order issued by the 

administrative judge, only if the agency determines:


(1) that the administrative law judge did not properly apply or interpret applicable
law, agency rules, written policies provided under Subsection (c), or prior
administrative decisions;


(2) that a prior administrative decision on which the administrative law judge relied
is incorrect or should be changed; or


(3) that a technical error in a finding of fact should be changed.


The agency shall state in writing the specific reason and legal basis for a change made
under this subsection.


Tex. Gov't Code Ann. § 2001.058(e) (West 1998).

 To the contrary, we read the statute as giving the Commission authority to supplant the
ALJ's findings. Rather than imposing the general, restrictive APA section 2001.058 on Commission
proceedings heard by SOAH, the legislature created a specific provision for such proceedings. We
construe an unambiguous statute according to its commonly understood meaning. Cail v. Service Motors,
Inc., 660 S.W.2d 814, 815 (Tex. 1983). The statute imposes the classic "preponderance of the evidence"
evidentiary standard used by original fact-finders in most civil trials. See State v. Turner, 556 S.W.2d
563, 565 (Tex. 1977), cert. denied, 435 U.S. 929 (1978). Accordingly, section 2003.049(g) allows the
Commission to assume an original fact-finding role. Pursuant to the statute, the Commission may evaluate
the evidence put before the ALJ at a SOAH hearing and determine whether the ALJ's findings are
supported by a preponderance of the evidence.

 In support of its contention that the statute imposes an appellate or deferential type of
review on the Commission, Southwestern cites our opinion in Hunter Industrial Facilities, Inc. v. Texas
Natural Resource Conservation Commission, 910 S.W.2d 96 (Tex. App.--Austin 1995, writ denied). 
In Hunter, we interpreted a provision in the Solid Waste Disposal Act that appeared to restrict the Texas
Natural Resource Conservation Commission's (TNRCC's) ability to change an ALJ's finding of fact. The
statute read, "The commission may overturn an underlying finding of fact . . . only if the commission finds
that the finding was not supported by the great weight of the evidence." Tex. Health & Safety Code Ann.
§ 361.0832(c) (West 1992). We said this was a "significant" restriction on the agency's discretion to
overturn an ALJ's finding. Hunter, 910 S.W.2d at 103. We attempted to contrast this standard with the
one applicable to TNRCC proceedings before the enactment of section 361.08329(c). We said, "Before
the enactment of subsection (c), the Commission had broad discretion to reject an examiner's underlying
fact findings. This discretion was limited only by the requirement that an agency's final decision be
supported by substantial evidence in the record." Id. (citations omitted, emphasis added). 
Southwestern seizes on this language and argues if section 361.0832 restricted the TNRCC's discretion,
surely section 2003.049 restricts the Commission's.

 The above-quoted discussion in Hunter has apparently misled some readers. Some
construe it as suggesting that the preponderance of the evidence standard of proof was never applicable
to TNRCC proceedings, either before or after the enactment of section 361.0832(c). In other words, they
construe Hunter as allowing the agency to overturn an ALJ's finding just because it is not supported by
the great weight of the evidence, without regard to whether the contrary position is supported by a
preponderance of the evidence. This interpretation is reinforced by Hunter's characterization of section
361.0832(c) as a "significant" restriction on the agency's discretion to overturn an ALJ's finding. This
characterization might suggest to some that the agency, before section 361.0832(c), had the discretion to
overturn an ALJ's finding even if a huge amount of the evidence supported it, but a very small amount of
the evidence supported the opposite conclusion. That was never the case.

 Hunter did not abrogate the well-established rule that the standard of proof for any
administrative agency finding can never be less than a preponderance of the evidence. We reiterated this
rule in Beaver Express Service, Inc. v. Railroad Commission of Texas and we have not since done
away with it, nor could we. See 727 S.W.2d 768, 775 n.3 (Tex. App.--Austin 1987, writ denied) (citing
3 Davis, Administrative Law Treatise, 255-56 (1980)). The preponderance of the evidence standard
of proof for agency findings is altogether different from the substantial-evidence scope of review applied
by reviewing courts to agency findings. See id.; Lewis v. Metropolitan Savings & Loan Ass'n, 550
S.W.2d 11, 15 (Tex. 1977); Charlton v. Federal Trade Comm'n, 543 F.2d 903, 907 (D.C. Cir. 1976);
Clark & Lynch, Findings of Fact and Conclusions of Law in Agency Adjudications of Contested Cases,
Texas Administrative Practice and Procedure at E-1--E-35 (State Bar of Texas, 1985). Hunter may
have inadvertently blurred the distinction between the two.

 In any event, Hunter does not control this case. The statute at issue in Hunter dictated
a review by TNRRC that, while not the same as the review we conduct of trial-court findings, strongly
resembles an appellate scope of review. By contrast, the preponderance of the evidence standard in
section 2003.049(g)(1)(B) is not so deferential. It simply reiterates the principle that fact-finders must find
facts by a preponderance of the evidence in administrative proceedings. The language of section
2003.049(g)(1)(B) does not evidence an intent on the part of the legislature to change the way the
Commission reviewed ALJ findings after the creation of the utility division of SOAH.

 The legislature's intent to grant the Commission more fact-finding power than some other
agencies is further evidenced by the fact that the legislature saw fit to allow the Commission to conduct its
own hearings and bypass SOAH altogether if the Commission so chooses. See PURA 1995 § 1.101(e). 
Furthermore, the legislature did not revoke the Commission's express power to make findings of fact. See
PURA 1995 § 1.101(d). (8)

 Allowing the Commission more control over the ultimate disposition of its cases makes
sense in the public utility arena. Public utility matters are typically complex. They often involve objective
evidence that is more conducive to review on the record than evidence such as live witness testimony,
which is subject to credibility concerns. Based on these observations and, most importantly, the language
of the statute, we hold section 2003.049(g) allows the Commission to reevaluate the evidence admitted at
a SOAH hearing to determine whether the ALJ's findings are supported by a preponderance of the
evidence. In other words, we hold that section 2003.049(g) allows the Commission to substitute its
judgment for the ALJ's on questions of fact. 

 We note the Commission does not go unchecked in its reevaluation of the evidence
supporting an ALJ's finding. Section 2003.049(h) requires the Commission to state in writing the specific
reason and legal basis for any changes made pursuant to section 2003.049(g). Tex. Gov't Code Ann. §
2003.049(h). PURA 1995, in turn, subjects the Commission's order to judicial review under the
"substantial evidence rule." PURA 1995 § 1.301; (9) see also Tex. Gov't Code Ann. § 2001.174 (West
1998).


C. Judicial Review of Commission Fact-Finding under Section 2003.049(g)

 The district court ruled that substantial evidence supported the Commission's determination
that the ALJ's findings of fact were not supported by a preponderance of the evidence. Southwestern
characterizes the issue before the trial court as a legal issue. Southwestern then argues the district court
should have reviewed the Commission's determination for legal error (de novo), rather than for substantial-evidence support, citing Hunter, 910 S.W.2d at 105.

 As discussed above, Hunter involved a statute that allowed the TNRCC to change a
hearing examiner's finding of fact only if it was not supported by the great weight of the evidence. That
standard restricted the TNRCC's ability to reject the examiner's fact-findings and essentially put the
TNRCC in an appellate role. See id. at 103. In essence, the TNRCC was, therefore, making a legal
determination when it reviewed the sufficiency of the evidence supporting the hearing examiner's finding. 
For that reason, this Court determined that a reviewing court should review the TNRCC's rejection of an
examiner's findings for clear error. See id. at 105. 

 In contrast to the statute at issue in Hunter, section 2003.049(g) does not require the
Commission to give deference to the ALJ's findings. As discussed above, the statute allows the
Commission to weigh the evidence anew. The resulting findings are purely factual in nature. 

 This distinction dictates that a reviewing court review the Commission's decision for
substantial-evidence support, rather than for legal error. See Lauderdale v. Texas Dep't of Agriculture,
923 S.W.2d 834, 836-37 (Tex. App.--Austin 1996, no writ) (clarifying that reviewing court measures
agency findings of fact against evidence; court reviews agency's legal conclusions for legal error or for
statutory authority). In fact, the court is prohibited from substituting its judgment for the agency's as to the
weight of the evidence on questions committed to agency discretion. APA § 2001.174; Texas Health
Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984); Railroad
Comm'n v. Shell Oil Co., 161 S.W.2d 1022, 1028-29 (Tex. 1942). In other words, the court may not
determine the correctness of the agency's finding. Charter Medical, 665 S.W.2d at 452. A court that
is reviewing purely factual administrative findings may determine only whether substantial evidence supports
those findings. Id. at 452-53. The evidence may actually preponderate against the agency's finding and
the court must still uphold it if enough evidence suggests the agency's determination was within the bounds
of reasonableness (i.e., if substantial evidence supports the agency's determination). See id. at 452-53. 
These principles originate in the Texas Constitution and the doctrine of separation of powers. See Railroad
Comm'n v. Shell Oil Co., 161 S.W.2d at 1028-29. Nothing in section 2003.049(g)(1)(B) indicates the
legislature intended to transfer fact-finding power from the Commission to the judicial branch of
government. We, therefore, conclude the Commission's fact-findings were subject to substantial-evidence
review rather than "de novo" legal error review.

 The district court clearly reviewed the Commission's factual determination for substantial-evidence support. We, therefore, hold that the district court applied the correct scope of review.


D. Evidence Supporting the Commission's Factual Determination

 Southwestern contends in the remainder of its point of error that the Commission's factual
determination is not supported by substantial evidence. We have already set forth the particulars of
substantial-evidence review. We presume substantial evidence supports an agency's findings and the
contestant bears the burden of proving otherwise. Id.

 A party may challenge a finding for lack of substantial evidentiary support in two ways. 
First, the party may argue the findings of underlying fact stated in the order do not fairly support the
agency's ultimate finding of fact. See United Resource Recovery, Inc. v. Texas Water Comm'n, 815
S.W.2d 797, 801 (Tex. App.--Austin 1991, writ denied) (citing Charter Medical, 665 S.W.2d at 452). 
Second, the party may argue the findings of underlying fact do not have reasonable support in the evidence
adduced at the evidentiary hearing. Id.

 Southwestern challenges the ultimate determination that a preponderance of the evidence
supported the Commission's findings, as opposed to the ALJ's. This challenge necessarily calls into
question the Commission's underlying findings of fact pertaining to the two fuel reconciliation issues
mentioned previously: (1) the prudence of Southwestern's choice of fuel during the reconciliation period
and (2) the accuracy of Southwestern's accounting for fuel costs during that time. Southwestern does not
contend the underlying findings are unsupported by the record. Instead, Southwestern attacks the
Commission's reasoning and argues the underlying findings do not support the ultimate decision to reject
the ALJ's proposed findings. Consequently, we characterize Southwestern's argument as the first type of
substantial evidence challenge.

 We will first address the Commission's findings concerning the prudence of Southwestern's
choice of fuel. (10) Utilities use coal, gas, or both to generate electricity. According to the Commission's
findings, Southwestern burned more coal and less gas than it should have in early 1992, resulting in
unreasonably high fuel costs. The findings explain the basis for the Commission's judgment. That is: (1)
Southwestern was obligated under take-or-pay contracts to purchase a certain amount of coal during 1992;
(2) the contracts would have allowed Southwestern to defer purchasing coal until later in the year; (3) gas
prices were unusually low in early 1992; (4) rather than use more gas and less coal, Southwestern
purchased more coal than its contracts required; (5) Southwestern's fuel planning scheme did not consider
all the options available and did not take into account the unusual market conditions in early 1992; and (6)
consequently, Southwestern should have saved money on its fuel expenses but did not. For these reasons,
the Commission found Southwestern had not proven by a preponderance of the evidence that its choice
of fuel was reasonable during this portion of the reconciliation period. The Commission's logic, as
explained in the underlying and ultimate findings of fact, is reasonable. We hold, therefore, that
Southwestern has failed to challenge successfully the findings pertaining to its choice of fuel.

 The second set of findings Southwestern challenges are those pertaining to the accuracy
of Southwestern's accounting for certain fuel costs during the reconciliation period. (11) Utilities like
Southwestern that generate their own electricity sometimes generate more than their regular customers
consume. The utilities sometimes sell the excess in bulk to other consumers. The utilities must then allocate
their fuel costs between sales to their regular customers and sales to the purchasers of the excess electricity. 
The Commission found Southwestern failed to prove the accuracy of its allocation method, noting: (1)
Southwestern used a new, unconventional program to allocate its fuel costs; (2) the new program indicated
a decrease of fuel costs associated with generation of excess electricity; (3) another expert performed his
own calculations using a more common method of analysis and determined that Southwestern had
underestimated the fuel costs associated with the sale of excess electricity; and (4) Southwestern refused
to disclose the algorithms used by its program. The Commission's findings that Southwestern failed to
prove the accuracy of its fuel-allocation program are, therefore, reasonable. Having considered and
rejected Southwestern's challenge to the Commission's findings, we overrule Southwestern's point of error.


II. The Commission's and the City's Appeal

 The Commission and the City bring a point of error challenging the district court's reversal
of the Commission's order requiring Southwestern to reimburse the City for its costs. 

 Cities generally have standing to participate in Commission proceedings concerning utilities
serving their areas. PURA 1995 § 2.106(b). (12) In ratemaking proceedings, public utilities must reimburse
cities for their reasonable costs. Id. § 2.106(a). (13) The Commission determined that this fuel reconciliation
case was a ratemaking proceeding and, consequently, required Southwestern to pay the City's costs. The
district court reversed the Commission's decision and ordered the City to pay its own costs. We must
decide whether a fuel reconciliation proceeding is a ratemaking proceeding.

 PURA 1995 defines a ratemaking proceeding as a proceeding "in which rates are changed,
except the term shall include proceedings initiated under Section 2.051 of [PURA 1995]." Id. §
1.003(13A). (14) "Rates" include "every compensation . . . charged, or collected whether directly or
indirectly by any public utility for [electricity] . . ." Id. §§ 1.003(14) & 2.0011(6). (15) The Commission
argues fuel reconciliation proceedings fall within these definitions because they result in an immediate change
in the utility customer's bill. Southwestern, on the other hand, argues: (1) fuel reconciliation proceedings
do not change "rates," (2) a provision in PURA 1995 takes fuel reconciliation proceedings out of the
ratemaking category, and (3) caselaw supports its argument. After reviewing the authorities cited by
Southwestern, we conclude fuel reconciliation proceedings are ratemaking proceedings.

 First, we disagree with Southwestern's argument that fuel reconciliation proceedings do
not change rates. Southwestern suggests the result of a fuel reconciliation proceeding does not affect
"rates" because it usually consists of a one-time surcharge or refund on a customer's bill. The definition
of rate does not require the compensation charged to be periodic or repetitive in nature. The definition
includes every charge collected. Id.

 Second, although Southwestern did not specify which PURA 1995 section it relied upon
when it filed its petition, Southwestern suggests this proceeding was initiated under section 2.212(g). See
PURA 1995 § 2.212. Section 2.212 is the vehicle utilities use to seek to change their preestablished rates
for a number of reasons. See PURA 1995 § 2.212. Section 2.212 first sets forth procedures, including
application requirements, notice requirements, and deadlines, generally applicable to proceedings brought
under the section. See, e.g., id. § 2.212(a), (c), (d), & (e). After a hearing is conducted pursuant to the
statute, the Commission sets the rates of the utility involved in the proceeding. Id. § 2.212(f).

 Fuel reconciliation is mentioned in section 2.212(g). Id. § 2.212(g). Subsection (g)(2)(C)
contains language Southwestern contends supports its argument: "a proceeding under [subsection (g)] may
not be considered a rate case under [section 2.212]." Id. § 2.212(g)(2)(C) (emphasis added). 
Southwestern argues this declaration means a fuel reconciliation proceeding brought under subsection (g)
is not a ratemaking proceeding.

 We disagree. First, section 2.212(g) governs proceedings in which utilities seek to adjust
their fuel factors, a component of a utility's rate. Southwestern did not seek an adjustment of its fuel factor
in its petition for reconciliation. Therefore, it is not clear that this proceeding arose under section 2.212(g). 
We will assume it did, however, for argument's sake and because section 2.212(g) does mention the
concept of fuel reconciliation.

 Even if section 2.212(g) applies, the language of the statute does not support
Southwestern's argument. Had the legislature meant to exclude fuel reconciliation proceedings from the
ratemaking category, it could have said a proceeding under subsection (g) "may not be considered a
ratemaking proceeding under section 1.003(13A)." Better yet, the legislature might have excluded fuel
reconciliation proceedings in the very definition of ratemaking proceedings. The legislature did neither of
those things. The use of the term "rate case" instead of "ratemaking proceeding" and the limitation of the
provision to section 2.212 proceedings convinces us that the legislature did not intend to exclude fuel
reconciliation proceedings from the category of ratemaking proceedings.

 The exact implications of subsection (g)(2)(C) are not entirely clear to us. The provision
clearly relates to the distinction between fuel-related proceedings and other types of section 2.212
proceedings. Subsection (g)(2)(C) is not the only provision that distinguishes between the two. Section
2.212(g)(2)(A) and the Commission's rules maintain a distinction between general "rate cases" or "rate
proceedings" under section 2.212 and fuel-related proceedings. See, e.g., PURA 1995 § 2.212(g)(2)(A);
16 Tex. Admin. Code § 23.23(b)(3). Perhaps the distinction reflects the legislature's intent that fuel-related
proceedings may be conducted separately from others that involve rate-changes and that they need not
satisfy the procedural requirements of other section 2.212 proceedings. This argument is bolstered by the
fact that the subsection directly preceding subsection (g)(2)(C) directs the Commission to implement rules
for the "timely" reconciliation of a utility's fuel expenses. Id. § 2.212(g)(2)(B). The Commission has in fact
promulgated procedural requirements, including application requirements, notice requirements, and
deadlines, for fuel reconciliation proceedings. See 16 T.A.C. § 23.23(b). Those procedures differ from
those generally applicable to other section 2.212 proceedings. The distinction between "rate cases" under
section 2.212 and fuel-related proceedings may have more implications than the procedural differences
noted. Any additional implications are material, however, only to the interplay between fuel-related
proceedings and other types of section 2.212 proceedings.

 Finally, Southwestern contends two of our previous opinions exclude fuel reconciliation
proceedings from ratemaking proceedings: City of El Paso v. Public Utility Commission of Texas, 609
S.W.2d 574, 579 (Tex. App.--Austin 1980, writ ref'd n.r.e.) and El Paso Electric Co. v. Public Utility
Commission of Texas, 917 S.W.2d 846, 863 (Tex. App.--Austin 1995), judgm't withdrawn and
cause dism'd by agr., 917 S.W.2d 872 (Tex. App.--Austin 1996). We first note neither case involved
a fuel reconciliation proceeding.

 In City of El Paso, the city sought reimbursement for its participation in a dispute over the
issuance of a certificate of convenience and necessity. We held the proceeding was not a ratemaking
proceeding. 609 S.W.2d at 579. We explained that ratemaking proceedings are those "held to set rates,
i.e., when acting upon a formally filed 'Statement of Intent' for a rate increase or decrease." Id.; see
PURA 1995 §§ 2.105(c) & 2.212(a) (16) (explaining purpose and requirements of "Statement of Intent").

 We further discussed this requirement in El Paso Electric Company. 917 S.W.2d at 863. 
In that case, a city sought reimbursement for its participation in dockets that were closely connected to rates
but that did not involve the actual setting of rates. We held those dockets were not ratemaking
proceedings. Id. We noted that no "Statement of Intent" to change rates had been filed in those dockets. 
Id. We explained that although the result of a proceeding may eventually affect rates, the proceeding is not
a ratemaking proceeding unless it is exclusively devoted to rates. 

 Southwestern argues our opinions in City of El Paso and El Paso Electric Company limit
ratemaking proceedings to those initiated with a "Statement of Intent." Matters initiated with a "Statement
of Intent" clearly fall within the definition of ratemaking proceedings, but they are not the only matters that
involve the setting of rates. In fuel reconciliation proceedings, a utility does not file a "Statement of Intent,"
but it does file the functional equivalent of one, a "Petition to Reconcile Fuel Expenses." See 16 Tex.
Admin. Code § 23.23(b)(3)(A). The requirement that a ratemaking proceeding be the result of some sort
of application to change the amount of money a utility can charge its customers simply ensures that the
proceeding is one directly devoted to setting rates and is not one peripherally related to rates.

 We hold that this proceeding falls within the definition of a ratemaking proceeding because
it changed the compensation Southwestern can charge its customers for the electricity it has provided. (17)
 
The result of this fuel reconciliation proceeding was to allow Southwestern to recoup some of its
unexpected fuel expenses, but not all of them, by increasing the amount of money it charged its customers. 
The Commission rules concerning fuel reconciliation proceedings explain how a utility goes about
surcharging or refunding the money. See 16 Tex. Admin. Code § 23.23(b)(3)(C). That fuel reconciliation
proceedings begin with a "Petition to Reconcile Fuel Expenses" rather than a "Statement of Intent" is of
no consequence. Our holding is consistent with the reasoning in City of El Paso and El Paso Electric
Company. That is, not all matters that have a potential effect on rates are ratemaking proceedings. Only
matters directly resulting in changed rates constitute ratemaking proceedings. The trial court erred in
denying the City reimbursement for its costs under PURA 1995 section 2.106(a) and we sustain the City's
and the Commission's point of error.


CONCLUSION

 We have determined that: (1) Texas Government Code section 2003.049(g) applies to
Commission proceedings pending before September 1, 1995; (2) section 2003.049(g) allows the
Commission to reevaluate the evidence supporting an ALJ's findings of fact and determine the factual issues
anew; (3) a reviewing court may not substitute its judgment for the Commission's on an issue of fact and
is limited to determining whether the finding of fact is supported by substantial evidence; and (4) the findings
Southwestern challenges meet the requirements of the substantial evidence test. We have also determined
that the Commission was correct in treating this fuel reconciliation as a ratemaking proceeding and requiring
Southwestern to reimburse the City for its costs.

 Consequently, we reverse the district court's judgment insofar as it denies the City its
reasonable costs. We render judgment that Southwestern pay the City its reasonable costs. We affirm
the district court's judgment in all other respects.



 _____________________________________________

 Jimmy Carroll, Chief Justice

Before Chief Justice Carroll, Justices Jones and Kidd

Affirmed in Part; Reversed and Rendered in Part

Filed: January 29, 1998

Publish

1. Appellees ASARCO, Inc., and Texas Industrial Energy Consumers were intervenors in the
Commission and district court proceedings and are aligned with the City and the Commission with respect
to Southwestern's appeal. Neither ASARCO nor Texas Industrial Energy Consumers appealed the district
court's judgment; therefore, they do not join the Commission and the City in their appeal against
Southwestern.
2. The Public Utility Regulatory Act of 1995 was in effect when the Commission and the district
court heard this case and when the parties briefed their appeals. See Public Utility Regulatory Act of 1995,
74th Leg., R.S., ch. 9, § 1, 1995 Tex. Gen. Laws 31, amended by Act of May 16, 1995, 74th Leg., R.S.,
ch. 231, §§ 1 to 49, 1995 Tex. Gen. Laws 2017, Act of May 27, 1995, 74th Leg., R.S., ch. 260, §§ 49
& 50, 1995 Tex. Gen. Laws 2494, Act of May 27, 1995, 74th Leg., R.S., ch. 765, §§ 1.01 to 1.34, 2.01
to 2.23, 1995 Tex. Gen. Laws 3972, and Act of May 27, 1995, 74th Leg., R.S., ch. 1013, § 1, 1995 Tex.
Gen. Laws 5068 (formerly Tex. Rev. Civ. Stat. Ann. art. 1446c-0). The legislature has since codified and
renumbered the provisions of the Act in the Texas Utilities Code, effective September 1, 1997. See Act
of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713. We will discuss the case in
terms of PURA 1995, footnoting the analogous provisions in the Texas Utility Code.
3. See Tex. Util. Code Ann. §§ 34.171(1), 34.172, & 36.203(e) (West 1998).
4. At the time the case was before the Commission and the district court, the statute was codified
at Texas Government Code section 2003.047. See Act of May 27, 1995, 74th Leg., R.S., ch. 765, §
1.35, 1995 Tex. Gen. Laws 3986. The legislature also enacted a similar provision applicable to a different
agency under the same number. See Act of May 4, 1995, 74th Leg., R.S., ch. 106, § 1, 1995 Tex. Gen.
Laws 898. The legislature has since renumbered the statute applicable to the Commission as section
2003.049. See Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 31.01(49), 1997 Tex. Sess. Law Serv.
710 (West). To avoid confusion, we will cite to the current code.
5. See Tex. Util. Code Ann. § 15.001 (West 1998).
6. The trial court ruled that section 2003.049(g) applies. Neither the City nor the Commission
challenges this ruling in a point of error. The Commission does, however, assert in response to
Southwestern's point of error that the district court erred in applying section 2003.049. We will not,
therefore, accept the ruling as unchallenged.
7. At the time Southwestern briefed this case, the section read:


A state agency may change a finding of fact or conclusion of law made by the
administrative law judge, or may vacate or modify an order issued by the
administrative law judge, only for reasons of policy. The agency shall state in writing
the reason and legal basis for a change made under this subsection.

8. See Tex. Util. Code Ann. § 14.051(5) (West 1998).
9. See Tex. Util. Code Ann. § 15.001 (West 1998).
10. In Findings of Fact 37 through 46(e), the Commission found:


37. The natural gas price delivered to utilities in West Texas dropped from
approximately $2.20 per MMBtu in December 1991 to less than $1.20 per
MMBtu by the end of January 1992.

38. Under the Tolk Agreement, Southwestern has to purchase a minimum of 46.59
Tbtu (46,590,000 MMBtu) per year plus any additional coal required to generate
power for on-system sales.

39(a). PROMOD is a production cost model used to simulate an electric system's
operation and is a common and efficient method of evaluating a utility's historical
performance.

39(b). At the request of Commission staff, Southwestern ran two modeled scenarios,
establishing a benchmark and a change case.

39(c). A comparison of the benchmark and the change case in the PROMOD runs
indicated that Southwestern could have realized $2,327,900 in fuel savings.

39(d). Commission staff ran a spreadsheet analysis which indicated a potential fuel
savings of $2,064,686, which translates to $1,243,057 on a Texas retail basis.

40. Southwestern bases its generation planning on its generation and Fuel Use
Schedule, which estimates the gas prices for the remainder of the year.

41. The historical data (years 1990 and 1991) indicated that natural gas prices peak
during the winter months (Nov.-Feb.), decrease during the spring (March-May),
remain flat during the summer months (June-Aug.), and increase again during the
fall months (Sept.-Oct.).

42. Based on the historical trends, Southwestern developed its Fuel Use Schedule for
the 1992 winter months.

43. In early 1992, the on-system coal prices were forecasted to be higher than the
natural gas prices; therefore, Southwestern planned to purchase only its take-or-pay quantity of contract coal, which would allow it to take advantage of the low
natural gas prices.

44(a). In early 1992, extremely low natural gas prices combined with low system demand
provided unique opportunities for Southwestern to displace a portion of its higher
priced on-system Tolk generation with lower priced natural gas-fired generation.

45. If Southwestern was to displace its entire take-or-pay coal obligations during the
winter months, those volumes would have to be made up in later months.

46(a). Southwestern's monthly fuel plans in early 1992 included minimum target volume
for coal usage at Tolk Station.

46(b). During the reconciliation period, Southwestern burned far in excess of its minimum
coal obligations under its take-or-pay contracts.

46(c). Southwestern had a high degree of flexibility to meet its coal contract obligations.

46(d). Southwestern failed to explore all of the reasonable fuel options available during
the reconciliation period.

46(e). Southwestern's modeling process did not consider the alternative of removing one
of the Tolk units from the generation mix.
11. The Commission found in Findings of Fact 63 to 70:


63. The heat rate of a generating unit is the thermal input divided by the electrical
output with a higher heat rate indicating that more fuel was used to produce the
electrical output, a lower heat rate indicating that less fuel was used.

64. During the reconciliation period, Southwestern used two different methods to
determine the fuel costs for off system sales.

64(a). Heat rates measure the efficiency of a generating unit to convert fuel into electricity.

65(a). During the reconciliation period, Southwestern switched its method for calculating
off-system sales heat rates from a batch program to a new economic dispatch
program (EDP) and did not institute a change in plant technology or operations. 
After the conversion, Southwestern experienced (on paper) a decrease of 1,334
Btu/kWh in incremental heat rates for off-system sales.

66(a). Southwestern never disclosed the algorithms of its EDP due to the proprietary
nature of the software.

66(b). Because TIEC did not have access to the EDP, TIEC attempted to replicate the
EDP with a spreadsheet analysis, the results of which indicated that Southwestern
used more fuel to generate electricity for off-system sales and confirmed the
change in relationship between on-system and off-system incremental heat rates.

66(c). Southwestern's EDP is not a typical economic dispatch because it uses two
different sets of fuel prices for native load and off-system sales.

66(d). The accuracy of Southwestern's EDP is unverifiable.

66(e). Southwestern failed to prove that it properly allocated fuel costs to ratepayers with
its method of calculating off-system sale heat rates; therefore, the disallowance of
$624,000 advocated by TIEC is reasonable.

67. The actual incremental heat rate should be used to determine off-system sales.

68. Southwestern's dispatch system calculates the fuel usage and costs every 20
seconds.

69. The actual contract or spot fuel price more accurately reflects the cost of fuel for
off-system sales.

70. Southwestern dispatches off-system sales from all of its generating units.
12. See Tex. Util. Code Ann. § 33.025(a) (West 1998).
13. See Tex. Util. Code Ann. § 33.023(b) (West 1998).
14. See Tex. Util. Code Ann. § 11.003(16)(A) (West 1998).
15. See Tex. Util. Code Ann. §§ 11.003(15)(A) & 31.002(6) (West 1998). 
16. See Tex. Util. Code Ann. §§ 33.024 & 36.102 (West 1998).
17. This proceeding might even fit under the definition as one instituted under PURA 1995 section
2.051. Section 2.051 provides for reconciliation proceedings in general, including those conducted to
reconcile purchased power costs. PURA 1995 § 2.051(cc). That section also requires the Commission
to promulgate rules for proceedings to reconcile all cost recovery factors, including purchased power costs. 
Id. The Commission satisfied this requirement with respect to fuel reconciliation by promulgating Rule
23.23(b)(3). See 16 Tex. Admin. Code § 23.23(b)(3) (1997). Southwestern's Petition to Reconcile Fuel
Expenses does not cite any PURA 1995 provision as authority to initiate a fuel reconciliation proceeding. 
It does, however, cite Rule 23.23 and seek to reconcile purchased power costs. It is arguable, therefore,
that this fuel reconciliation proceeding was initiated under section 2.051 and that it therefore qualifies as a
ratemaking proceeding for that reason alone. Because neither party argued this theory, we do not base
our holding upon it.



s of its minimum
coal obligations under its take-or-pay contracts.

46(c). Southwestern had a high degree of flexibility to meet its coal contract obligations.

46(d). Southwestern failed to explore all of the reasonable fuel options available during
the reconc