# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00116-CV

**Cities of Corpus Christi, et al. and Office of Public Utility Counsel, Appellants**

**v.**

**Public Utility Commission of Texas and AEP Texas Central Company, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. D-1-GN-08-001522, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an administrative appeal challenging an order of the Public Utility Commission of Texas approving the application of AEP Texas Central Company (TCC) to increase its base rates and simultaneously terminate "merger savings" and "rate reduction" riders in TCC's tariff. The riders had been implemented under a 1999 stipulation or agreement entered into in connection with the merger of TCC's parent corporation, American Electric Power Corporation (AEP) with Central and Southwest Corporation (CSW). The district court affirmed the Commission's order as to all matters at issue here. A group of eighty-three cities (Cities), including the City of Corpus Christi, and the Office of Public Utility Counsel (OPC) appeal the district court's order. In a single issue, OPC complains that in permitting TCC to terminate the merger savings and rate reduction riders, the Commission misconstrued the stipulation and utilities code. In two issues, the Cities argue that the Commission misconstrued its own rules in approving the inclusion of certain

energy-efficiency costs in TCC's rates and improperly determined TCC's consolidated tax savings allocation. We will affirm the district court's judgment.

**BACKGROUND**

TCC is an electric utility operating company and wholly-owned subsidiary of AEP. TCC provides transmission and distribution utility services to forty-four counties in South Texas.

In 1999, in Docket No. 19265, the Commission approved a stipulation, titled the "Integrated Stipulation and Agreement" (ISA), in connection with its finding that the merger of CSW with AEP was consistent with the public interest. The ISA required each "Texas Operating Company" (i.e., TCC) to provide its customers certain rate credits during the six-year period following the closing of the merger. Simply described, these rate credits were to vary each year during the six-year period. Thereafter, some of the credits were to continue until "base rates for [TCC] are changed." The AEP-CSW merger closed in June 2000. The rate credits called for under the ISA were implemented through "merger savings" and "rate reduction" riders in TCC's tariff.

On November 9, 2006—more than six years after the AEP-CSW merger—TCC filed an application for authority to increase its base rates and to terminate the merger savings and rate reduction riders. The Commission referred the proceeding to the State Office of Administrative Hearings (SOAH). OPC and the Cities, among other parties, intervened.

TCC proposed an effective date for its new rates of December 14, 2006, but, pursuant to PURA section 36.108(a)(2), the Commission suspended the effective date for 150 days, making the changed rates effective May 13, 2007. *See* Tex. Util. Code Ann. § 36.108(2) (West 2007). This

2

date was subsequently postponed further by agreement. The hearing on the merits commenced on April 12, 2007, and ultimately concluded on May 4, 2007.

On April 17, 2007, TCC filed notice of its intent to put into effect, under bond, new rates (including terminating the merger savings and rate reduction riders) effective on or after May 30, 2007. *See id.* § 36.110(a) (West 2007) (if Commission has not made final determination in rate case within 150 days from the utility's proposed effective date, utility is permitted to unilaterally place changed rates into effect under bond). TCC filed its bonded rates effective May 30, 2007. At that time, it was allowed to terminate the merger savings and rate reduction riders.

OPC disputed that bonded, interim rates under PURA 36.110(a) were a "change" in "rates" as contemplated under the ISA and urged that such a "change" would occur only if and when the Commission issued a final order approving the new rates. The Cities, on the other hand, took issue with the TCC's proposed inclusion of certain energy-efficiency costs in its new rates and the determination of TCC's consolidated tax savings allocation.

In December 2007, the Commission issued a final order setting new rates for TCC and approving termination of the merger savings and reduction riders. After the Commission denied motions for rehearing, OPC and the Cities filed suit for judicial review, in which TCC intervened. After consolidating the cases, the district court affirmed the Commission's order as to all issues raised here.

3

**ANALYSIS**

On appeal, in its sole issue, OPC brings forward its complaint that the Commission improperly terminated the merger savings and rate reduction riders, while the Cities, in two issues, bring forward their arguments regarding energy-efficiency costs and TCC's consolidated tax savings allocation.

**Standard of review**

To the extent that appellants' issues concern factual determinations made by the Commission, we review them under the substantial-evidence standard. *See id.* § 15.001 (West 2007); *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 184 (Tex. App.—Austin 2004, no pet.). We presume that the Commission's findings are supported by substantial evidence, and the contestant bears the burden of proving otherwise. *See Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied). We will reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced by an agency's findings that are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2008). However, we may not substitute our judgment for that of the agency on the weight of the evidence. *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215. "Substantial evidence" does not mean a large or considerable amount of evidence but such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact. *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988); *Lauderdale v. Department of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ). The test is not whether the agency made the correct conclusion in our view but whether some reasonable

4

basis exists in the record for the agency's action. *Railroad Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991). We must uphold an agency's finding even if the evidence actually preponderates against it so long as enough evidence suggests the agency's determination was within the bounds of reasonableness. *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215.

To the extent that the parties' issues turn on construction of the utilities code and the ISA, however, we review these questions of law de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *Id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). However, with regard to a statute that an agency is charged with enforcing, we give "serious consideration" to the agency's construction of it, so long as that construction is reasonable and consistent with the statutory language, and this is particularly true when the statute involves complex subject matter within the agency's area of expertise. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008); *cf. Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.) (courts "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise or deal with a nontechnical question of law").

5

In interpreting the ISA, a stipulation and agreement approved by the Commission, we are guided by principles of contract construction. *See Cities of Abilene v. Public Util. Comm'n*, 146 S.W.3d 742, 747 (Tex. App.—Austin 2004, pet. denied). In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* at 229. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.*

Whether a contract is ambiguous is a question of law for the court. *Id.* If a contract is unambiguous, it can be given a definite or certain legal meaning, and an administrative interpretation of the contract is not entitled to a presumption of validity. *Cities of Abilene*, 146 S.W.3d at 748. If, however, a contract is found to be ambiguous, creating a fact issue as to the parties' intent, we must affirm the agency's interpretation if it is supported by substantial evidence. *Id.*

**OPC's appeal**

In its sole issue, OPC argues that the Commission improperly terminated the merger savings and rate reduction riders. OPC urges that the Commission misconstrued the ISA and the utilities code in determining that TCC's implementation of new rates under bond constituted the sort of "change" in TCC"s "base rates" that the ISA contemplated.

Concerning the merger savings rider, the ISA provided, with respect to TCC's rates following the sixth year after the merger:

> Each individual year's rate reduction will apply for a twelve month period with the last reduction [i.e., that in year six] continuing to apply in years following the end of year six until base rates for [TCC] are changed.

Regarding the rate reduction rider after year six, the ISA provided:

> The rate reduction rider . . . for such [TCC] will cease upon the effective date of new base rates for such company established pursuant to Section 36.151 or Section 36.101, PURA. In the absence of the establishment of new base rates for a [TCC] during the six year period, the rate reduction rider (Table H-1) . . . will continue to apply in the years following the end of year six until new base rates for such [TCC] are established. The supplemental rate reduction rider (Table H-2 of Attachment H) will remain in effect notwithstanding any base rate proceeding during the six year period after the effective date of the merger and will continue to apply in the years following the end of year six until base rates for the [TCC] are changed.

Because TCC's base rates were changed in 2005 as a result of Docket No. 28840, the rate reduction rider in Table H-1 was terminated, and only the supplemental rate reduction rider, along with the merger savings rider, remains at issue.

It is beyond dispute that TCC's implementation of new rates under bond resulted in its charging base rates to its customers that differed from those it charged previously. This would seem to be a "change" in "base rates" as those terms are ordinarily understood. In contending that this change in the base rates TCC was charging is nonetheless not a "change" in TCC's "base rates" under the ISA, OPC in essence argues that the terms have a technical meaning derived from the utilities code's provisions governing ratemaking. In OPC's view, a utility's "base rates" are not

7

"actually changed" under PURA unless and until the Commission approves them by final order—and temporary or interim rates implemented under bond do not count. However, PURA's text actually supports a contrary conclusion.

Under PURA, a utility, in anticipation of a permanent rate change, may post a bond and implement temporary rates, subject to refund, pending a final decision in the rate case. Tex. Util. Code Ann. § 36.110:

> An electric utility may put a changed rate into effect throughout the area in which the utility sought to change its rates, including an area over which the commission is exercising appellate or original jurisdiction, by filing a bond with the commission.

*Id.* § 36.110(a). Undercutting OPC's position is the legislature's use of "changed rate" to describe the rate being implemented under bond. In other words, according to the plain language of the statute, a "bonded rate" is a "changed rate." *See* Tex. Gov't Code Ann. § 311.011 ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"); *City of Rockwall*, 246 S.W.3d at 625-26.

OPC, however, attempts to draw a distinction between a utility's putting "a changed rate into effect" under PURA section 36.110 and changing the rate itself, which, in OPC's view, doesn't happen until the Commission issues a final order. OPC argues:

> PURA section 36.110 states that a utility "may put a changed rate into effect" by filing a bond; it does not say that a utility "may change its rates" by filing a bond. Changing an effective date does not render a rate changed; only the final action of the regulatory body can do so.

8

However, OPC's argument that "changing an effective date does not render a rate changed" fails to account for the legislature's use of the phrase "may put a changed rate into effect," which plainly contemplates a "changed rate" (past tense, not future) being put into effect.

We also observe that when bonded rates are implemented, the Commission, in its final order, trues-up the interim rates with the final rates and makes the final rates effective as of the date the bonded rates were implemented. *See* Tex. Util. Code Ann. § 36.110. While the Commission may ultimately determine the utility's rates to be higher or lower than the temporary bonded rates charged in the interim, it remains that the utility's rates have been changed as of the time the bonded rates were implemented. In short, nothing in PURA section 36.110 stands for the proposition that a "change" of "base rates" cannot occur until the Commission issues a final order.

Nor do other portions of PURA support OPC's view that a "change" in "base rates" means only a change by final Commission order. As TCC points out, PURA provides other means by which rates can be changed without a Commission final order. For example, if the Commission fails to act on an application for a rate change within the prescribed time period—within 150 days of the utility's proposed effective date plus an additional two days for each day the hearing on the merits exceeds fifteen days—the Commission is considered to have approved the rate change. Tex. Util. Code Ann. § 36.108(c).

In sum, there is nothing in the text of the ISA or PURA indicating that a "change" in TCC's "base rates" requires a change by final Commission order and excludes a change through implementation of bonded rates. This construction finds further support when considering the evident purposes of the rate reductions mandated in the ISA and the related provisions for

9

terminating them. During the period in which they were in effect, the rate reductions served to ensure that TCC's customers shared in the cost reductions and efficiencies that were anticipated to result from the AEP-CSW merger. *See City of Corpus Christi v. Public Util. Comm'n*, No. 03-06-00585-CV, 2008 Tex. App. LEXIS 1706, at \*14 (Tex. App.—Austin Mar. 5, 2008, no pet.) (mem. op.); Tex. Pub. Util. Comm'n, *Application of Central and South West Corporation and American Electric Power Company, Inc. Regarding Proposed Business Combination*, Docket No. 19265 (Order at 10, 20) (Nov. 18, 1999), *available at* http://interchange.puc.state.tx.us (accessed May 24, 2010). At the same time, TCC was allowed to benefit from any merger-related cost reductions actually achieved beyond those passed on to customers through the rate reductions. *See* Tex. Pub. Util. Comm'n*, Application of Central and South West Corporation and American Electric Power Company, Inc. Regarding Proposed Business Combination*, Docket No. 19265 (Order at 10, 20) (Nov. 18, 1999), *available at* http://interchange.puc.state.tx.us (accessed May 24, 2010). However, by providing that the rate reductions would terminate when TCC "base rates" were "changed," the ISA contemplated that whatever merger-related cost reductions were actually being achieved by the time of the ratemaking would be factored into TCC base rates. At that point, TCC's customers would continue to share in any such costs reductions, albeit indirectly through their impact on TCC's base rates rather than the specific rate-reduction riders. These underlying purposes are achieved regardless whether TCC's rates are changed through final Commission order or bonded rates. While bonded rates are temporary and are trued-up in the final Commission order, it remains that both rates incorporate any actual merger-related cost savings TCC has realized.

Alternatively, assuming that the ISA is ambiguous and could also be interpreted as OPC suggests, substantial evidence supports the Commission's interpretation. *See Cities of Abilene*, 146 S.W.3d at 748. The evidence submitted before the Commission is consistent with our construction of the ISA. It includes testimony accompanying the submission of the ISA to the Commission in Docket No. 19265. As set out by the testimony of David Carpenter, the "net merger savings rate reduction rider" was to be effective over a six-year period following the effective date of the merger and was intended to allow for the sharing of net merger savings between customers and shareholders of the operating companies involved. If base rates were changed during the merger savings sharing period, the net merger savings would continue to be paid to customers. However, because base rates would be calculated based on test year data that would reflect actual merger-related cost reductions, an adjustment to the test year data would be calculated to prevent double payment of net merger-related cost savings to customers. If base rates were changed after the expiration of the six-year net merger savings sharing period, the net merger savings rate reduction rider would terminate, and all merger savings would be reflected in rates. Thus, the intent of the parties to the agreement, as explained by Carpenter, was to ensure that rates be calculated in a manner such that customers shared in—but did not receive double payment for—merger-related savings. After year six, a changed base rate would fully reflect merger cost savings, and, to prevent double payment to the customer, the net merger savings rate reduction rider would terminate.

The rate change at issue here was initiated after the expiration of the six-year sharing period. As agreed by the parties, the bonded rates were fully cost-based, reflecting actual merger-related cost reductions. Consistent with the intent that customers not receive double payment

11

of merger cost savings, the implementation of these changed rates would require a simultaneous termination of the net merger savings rate reduction rider. Whether the rates were bonded rates or final approved rates is irrelevant. In either scenario, the intent of the ISA was that, in the event of a rate change after the six-year period, the changed rates would reflect actual merger savings, and the net merger savings rate reduction rider would terminate.

We overrule OPC's issue.

**The Cities' appeal**

The Cities present two issues—whether the Commission properly approved TCC's energy efficiency costs and whether the Commission correctly applied its precedent in Docket No. 28840 to determine TCC's consolidated tax savings allocation.

In their first issue, the Cities argue that TCC cannot recover funds for the purpose of achieving its energy-efficiency goals if those goals were not actually achieved. PURA section 39.905 sets out the legislature's energy efficiency mandates. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 328, § 1, 2005 Tex. Gen. Laws 958, 958 (current version codified at Tex. Util. Code Ann. § 39.905 (West Supp. 2009)). In section 39.905, the legislature established the goal that electric utilities reduce Texas customers' energy consumption. *Id.* (current version at Tex. Util. Code Ann. § 39.905(a)). To that end, electric utilities are required to administer energy savings incentive programs by providing incentives "for retail electric providers and competitive energy service providers to acquire additional cost-effective energy efficiency." *Id.* (current version at Tex. Util. Code Ann. § 39.905(a)(3)). At relevant times, this requirement was implemented by the following Commission rule:

12

> Funds for achieving the energy efficiency goal will be included in each utility's transmission and distribution rates.

25 Tex. Reg. 3002 (2000), *amended* 27 Tex. Reg. 9736 (2002), *amended* 30 Tex. Reg. 5787 (2005), *repealed* 33 Tex. Reg. 3586 (2008) (former 16 Tex. Admin. Code § 25.181) (Pub. Util. Comm'n).

It is undisputed that TCC did not meet its January 1, 2006 energy efficiency goal. It is, likewise, undisputed that the costs in dispute were, indeed, incurred for the purpose of achieving TCC's energy efficiency goals. The sole dispute here is whether, given that TCC did not actually meet its energy efficiency goals, costs incurred for that purpose can be included in TCC's rates.

The Cities' assertion that TCC can recover money spent to achieve its energy efficiency goal only if it actually achieves that goal finds no support in the plain language of the Commission rule. The rule contains no requirement that energy efficiency goals actually be achieved. Contrary to the Cities' assertions, the rule includes no language to the effect that a utility "must achieve the mandated goals" or that the goal must be "actually achieved." Because the rule is unambiguous and because its plain language allows for the recovery of funds spent to achieve energy efficiency goals with no requirement that energy efficiency goals be actually achieved, we adopt this plain-language interpretation. *See Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999).

Moreover, the Commission's interpretation that the rule allows rates to reflect funds spent to achieve the energy efficiency goal, regardless of whether the goal was actually met, is consistent with the rule's plain language and with the statutory framework established in PURA section 39.905. PURA section 39.905 provides that the required energy savings incentives may be

13

provided through "market-based standard offer programs or limited, targeted, market-transformation programs." *See* Act of May 29, 2005, 79th Leg., R.S., ch. 328, § 1, 2005 Tex. Gen. Laws 958, 958 (current version at Tex. Util. Code Ann. § 39.905(a)(3)). Thus, the statutory framework creates a situation in which electric utilities are required to provide energy efficiency incentives for retail electric providers and competitive energy service providers, but ultimately have little control over the success of these energy efficiency programs.

Consistent with this statutory framework—a framework in which the success of these energy efficiency programs is often beyond the control of the electric utilities—the plain language of the rule imposes no requirement that the energy efficiency goals be met as a prerequisite to recovering funds. And, consistent with the plain language of the statute and the rule, the Commission has interpreted the rule to allow rates to reflect funds spent to achieve the energy efficiency goal, regardless of whether the goal was actually met. We are required to uphold an agency's interpretation of its own rule where, as here, the agency's interpretation is consistent with the regulation and is not plainly erroneous. *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991).

Because the plain language of the rule imposes no requirement that energy efficiency goals be met as a prerequisite to recovery of funds spent to achieve those goals and because the Commission's interpretation—also imposing no requirement that the energy efficiency goal be achieved—is consistent with the goals set out in the statute, we hold that the Commission acted within its authority in allowing TCC to recover funds spent to achieve the energy efficiency goal, even though that goal was not actually achieved. Accordingly, we overrule the Cities' first issue.

14

In their second issue, the Cities argue that the Commission incorrectly applied its precedent in Docket No. 28840 to determine TCC's consolidated tax savings allocation. The Commission found that TCC's recoverable costs should be reduced for tax savings that could have been realized by filing a consolidated tax return with its affiliated companies. TCC argued that the adjustment was not required, but offered evidence that, if the Commission determined otherwise, the proper adjustment was $2.9 million, consistent with the manner with which the Commission had treated such tax savings in Docket No. 28840. The Cities argue that the Commission did not correctly follow precedent and that a larger adjustment was required.

PURA section 36.060 requires that, when setting rates, the Commission consider potential tax savings available to a utility through the filing of a consolidated return with affiliated corporations:

> Unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns, an electric utility's income taxes shall be computed as though a consolidated return had been filed and the utility had realized its fair share of the savings resulting from that return if:
>
> (1) the utility is a member of an affiliated group eligible to file a consolidated income tax return; and
>
> (2) it is advantageous to the utility to do so.

Tex. Util. Code Ann. § 36.060 (West 2007). An adjustment made to rates under this provision is referred to as the consolidated tax savings adjustment and is based on the value of the tax shield that the utility provides to the parent company and its nonregulated affiliates. *See City of Corpus Christi*, 2008 Tex. App. LEXIS 1706, at *28; Tex. Pub. Util. Comm'n, *Application of AEP Texas*

15

*Central Company for Authority to Change Rates*, Docket No. 28840 (Order at 38) (Aug. 15, 2005), *available at* http://interchange.puc.state.tx.us (accessed May 13, 2010). The legislature has granted the Commission broad discretion in determining a utility's fair share of the savings arising from the filing of a consolidated tax return by the parent company. *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied).

Contrary to the Cities' assertions, as supported by the record, the methodology adopted by the Commission here is consistent with that adopted by the Commission in Docket No. 28840 and approved by this court in *City of Corpus Christi*. *See City of Corpus Christi*, 2008 Tex. App. LEXIS 1706, at *25-30; Tex. Pub. Util. Comm'n, *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840 (Order at 38-39, 57) (Aug. 15, 2005), *available at* http://interchange.puc.state.tx.us (accessed May 13, 2010). In Docket No. 28840, TCC's last rate case, the Commission approved a method of determining the consolidated tax savings adjustment by which TCC's rate based percentage would be assigned to the transmission and distribution functions for each of the years prior to 2002 as a means of functionally assigning consolidated tax savings to the transmission and distribution functions, Tex. Pub. Util. Comm'n, *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840 (Order at 38) (Aug. 15, 2005), *available at* http://interchange.puc.state.tx.us (accessed May 13, 2010), and this Court affirmed the Commission's determination, *City of Corpus Christi*, 2008 Tex. App. LEXIS 1706, at *25-30. Thus, prior to 2002, the percentage of TCC's rate base investment assigned to the transmission and distribution functions provided a proxy for actual functional

16

taxable income, as functional taxable income information was unavailable until 2002, when the electric utility industry was unbundled in Texas.

Docket No. 28840 also included 2002, however, and in 2002, the first year in which functional taxable income information was available, instead of determining TCC's allocation of its consolidated tax savings adjustment to its transmission and distribution functions by means of a proxy, the Commission used the taxable income information reflected on the functional income tax returns. *See* Tex. Pub. Util. Comm'n, *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 33309 (Proposal for Decision at 159-60) (Aug. 30, 2007), *available at* http://interchange.puc.state.tx.us (accessed May 13, 2010). Thus, the Commission's decision in Docket No. 28840 reflects its determination that when actual functional taxable income information is available, that information—and not the proxy used in previous years—should be used to determine TCC's allocation of its consolidated tax savings adjustment to its transmission and distribution functions.

Our analysis shows that the Commission's decision to allocate TCC's consolidated tax savings adjustment to the transmission and distribution functions based on actual functional transmission and distribution taxable incomes when, as here, that information is available, is consistent with precedent established in Docket No. 28840 and approved by this court. In light of Commission precedent, and agreeing with the ALJ's finding that the "use of functional taxable income is the more logical methodology since the CTS itself is based on taxable income and losses," we cannot conclude that the Commission's decision to use functional taxable income to determine TCC's consolidated tax savings adjustment is arbitrary and capricious. *See* Tex. Pub. Util. Comm'n,

17

*Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 33309 (Proposal for Decision at 160) (Aug. 30, 2007), *available at* http://interchange.puc.state.tx.us (accessed May 13, 2010); *Gulf States Utils. Co.*, 809 S.W.2d at 207 (we reverse Commission decision as arbitrary and capricious if it fails to follow clear, unambiguous language of its own regulation).

The Cities also argue that—even if consistent with Commission precedent—the Commission's decision here is not supported by substantial evidence. This argument is based on differences in the allocation of tax savings to transmission and distribution functions in the period from 1991 through 2002, ranging from eighteen to twenty-four percent, and the period at issue here—from 2002 through 2005—in which the allocation was less than five percent for each year. According to the Cities, the record provides no explanation for the "huge changes in allocations over the historic period." The Cities, likewise, note the discrepancy between income reported on tax returns and income reported on FERC Form 1, for which, the Cities argue, TCC offers no plausible explanation. According to the Cities, these discrepancies exist because

> with no justification in the record, the Commission vitiated the 'consolidation' aspects of the adjustment by separating out the T&D [transmission and distribution] functions, calculating the pro forma tax returns for the T&D functions, and subtracting this taxable income from the total taxable income[,] . . . assuming that all the other income was related to the generation function.

The Commission's decision to adopt the consolidated tax savings adjustment proposed by TCC, the Cities argue, is therefore, not supported by substantial evidence.

18

Contrary to the Cities' assertions, however, substantial evidence supports the Commission's decision. TCC witness Jeffrey Bartsch, Director of Accounting and Regulatory Tax Support for AEP, testified that the Commission requires TCC to maintain separate functional books and records, including a general ledger, for its nuclear, generation, securitization, and transmission and distribution functions. As only legal tax entities are required to report information to the IRS, much of the information required to determine an entity's taxable income or loss is not included. But, as Bartsch testified, these separate functional books and records are used to prepare TCC's functional income tax return and consolidated income tax return.

Bartsch further testified that it is a common practice for companies, including TCC, to use different methods in determining book income and taxable income. Book value or book gains, which increase taxable income, may not be included in gross revenues for Federal Energy Regulatory Commission (FERC) reporting purposes, as FERC Form 1 contains book information rather than taxable information. Specifically, Bartsch explained the discrepancies between income reported on IRS returns and FERC forms in the years at issue by describing several post-2002 plant sales that generated taxable gains for the generation function but were not recorded in book gains and, therefore, not reported on FERC Form 1. In addition, Bartsch explained that the discrepancies between income reported on FERC Form 1 and IRS tax returns resulted from the fact that gross revenues are reported on IRS tax returns while net revenues are reported on FERC Form 1. In light of the differing manners by which revenues are reported and in light of sales that significantly increased taxable income but had no effect on book income, Bartsch testified, "it is completely reasonable that the generation function would have relatively high taxable income for

19

the years 2002 through 2005 since its plants were either being utilized to generate and sell electricity or, in 2004 and 2005, they were being sold."

As explained, under the substantial evidence standard of review, we presume that the Commission's findings are supported by substantial evidence, and the contestant bears the burden of proving otherwise. *See Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215. The Cities have not met their burden of showing that no reasonable basis exists in the record for the agency's action. *See Pend Oreille Oil & Gas Co.*, 817 S.W.2d at 41. As the Commission's decision to adopt TCC's proposed allocation methods and the Commission's determination of TCC's consolidated tax savings allocation are within the bounds of reasonableness, we are required to uphold that decision. *See Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215. Accordingly, we overrule the Cities' second issue.

## CONCLUSION

Having overruled each of appellants' issues, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed:   June 11, 2010