TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00116-CV






Cities of Corpus Christi, et al. and Office of Public Utility Counsel, Appellants


v.


Public Utility Commission of Texas and AEP Texas Central Company, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. D-1-GN-08-001522, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 This is an administrative appeal challenging an order of the Public Utility
Commission of Texas approving the application of AEP Texas Central Company (TCC) to increase
its base rates and simultaneously terminate "merger savings" and "rate reduction" riders in
TCC's tariff. The riders had been implemented under a 1999 stipulation or agreement entered into
in connection with the merger of TCC's parent corporation, American Electric Power Corporation
(AEP) with Central and Southwest Corporation (CSW). The district court affirmed the
Commission's order as to all matters at issue here. A group of eighty-three cities (Cities), including
the City of Corpus Christi, and the Office of Public Utility Counsel (OPC) appeal the district court's
order. In a single issue, OPC complains that in permitting TCC to terminate the merger savings and
rate reduction riders, the Commission misconstrued the stipulation and utilities code. In two issues,
the Cities argue that the Commission misconstrued its own rules in approving the inclusion of certain
energy-efficiency costs in TCC's rates and improperly determined TCC's consolidated tax savings
allocation. We will affirm the district court's judgment.


BACKGROUND

 TCC is an electric utility operating company and wholly-owned subsidiary of AEP. 
TCC provides transmission and distribution utility services to forty-four counties in South Texas. In 1999, in Docket No. 19265, the Commission approved a stipulation, titled the
"Integrated Stipulation and Agreement" (ISA), in connection with its finding that the merger of
CSW with AEP was consistent with the public interest. The ISA required each "Texas Operating
Company" (i.e., TCC) to provide its customers certain rate credits during the six-year period
following the closing of the merger. Simply described, these rate credits were to vary each year
during the six-year period. Thereafter, some of the credits were to continue until "base rates for
[TCC] are changed." The AEP-CSW merger closed in June 2000. The rate credits called for under
the ISA were implemented through "merger savings" and "rate reduction" riders in TCC's tariff.

 On November 9, 2006--more than six years after the AEP-CSW merger--TCC filed
an application for authority to increase its base rates and to terminate the merger savings and
rate reduction riders. The Commission referred the proceeding to the State Office of Administrative
Hearings (SOAH). OPC and the Cities, among other parties, intervened.

 TCC proposed an effective date for its new rates of December 14, 2006, but, pursuant
to PURA section 36.108(a)(2), the Commission suspended the effective date for 150 days, making
the changed rates effective May 13, 2007. See Tex. Util. Code Ann. § 36.108(2) (West 2007). This
date was subsequently postponed further by agreement. The hearing on the merits commenced on
April 12, 2007, and ultimately concluded on May 4, 2007.

 On April 17, 2007, TCC filed notice of its intent to put into effect, under bond,
new rates (including terminating the merger savings and rate reduction riders) effective on or after
May 30, 2007. See id. § 36.110(a) (West 2007) (if Commission has not made final determination
in rate case within 150 days from the utility's proposed effective date, utility is permitted to
unilaterally place changed rates into effect under bond). TCC filed its bonded rates effective
May 30, 2007. At that time, it was allowed to terminate the merger savings and rate reduction riders.
 OPC disputed that bonded, interim rates under PURA 36.110(a) were a "change" in
"rates" as contemplated under the ISA and urged that such a "change" would occur only if and when
the Commission issued a final order approving the new rates. The Cities, on the other hand, took
issue with the TCC's proposed inclusion of certain energy-efficiency costs in its new rates and the
determination of TCC's consolidated tax savings allocation.

 In December 2007, the Commission issued a final order setting new rates for TCC
and approving termination of the merger savings and reduction riders. After the Commission denied
motions for rehearing, OPC and the Cities filed suit for judicial review, in which TCC intervened. 
After consolidating the cases, the district court affirmed the Commission's order as to all issues
raised here. 




ANALYSIS

 On appeal, in its sole issue, OPC brings forward its complaint that the Commission
improperly terminated the merger savings and rate reduction riders, while the Cities, in two issues,
bring forward their arguments regarding energy-efficiency costs and TCC's consolidated tax
savings allocation.


Standard of review

 To the extent that appellants' issues concern factual determinations made by
the Commission, we review them under the substantial-evidence standard. See id. § 15.001
(West 2007); Reliant Energy, Inc. v. Public Util. Comm'n, 153 S.W.3d 174, 184 (Tex. App.--Austin
2004, no pet.). We presume that the Commission's findings are supported by substantial evidence,
and the contestant bears the burden of proving otherwise. See Southwestern Pub. Serv. Co. v. Public
Util. Comm'n, 962 S.W.2d 207, 215 (Tex. App.--Austin 1998, pet. denied). We will reverse and
remand the cause to the agency when substantial rights of the appellant have been prejudiced by an
agency's findings that are not reasonably supported by substantial evidence considering the
reliable evidence in the record as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2008). 
However, we may not substitute our judgment for that of the agency on the weight of the evidence. 
Southwestern Pub. Serv. Co., 962 S.W.2d at 215. "Substantial evidence" does not mean a large or
considerable amount of evidence but such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion of fact. Pierce v. Underwood, 487 U.S. 552, 564-65 (1988);
Lauderdale v. Department of Agric., 923 S.W.2d 834, 836 (Tex. App.--Austin 1996, no writ). The
test is not whether the agency made the correct conclusion in our view but whether some reasonable
basis exists in the record for the agency's action. Railroad Comm'n v. Pend Oreille Oil & Gas Co.,
817 S.W.2d 36, 41 (Tex. 1991). We must uphold an agency's finding even if the evidence actually
preponderates against it so long as enough evidence suggests the agency's determination was within
the bounds of reasonableness. Southwestern Pub. Serv. Co., 962 S.W.2d at 215. 

 To the extent that the parties' issues turn on construction of the utilities code and
the ISA, however, we review these questions of law de novo. See State v. Shumake, 199 S.W.3d
279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the
legislature's intent. Id. We seek that intent "first and foremost" in the statutory text. Lexington Ins.
Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text, unless
a different meaning is supplied by legislative definition or is apparent from context, or unless such
a construction leads to absurd results. City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26
(Tex. 2008); see Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read
in context and construed according to the rules of grammar and common usage."). However, with
regard to a statute that an agency is charged with enforcing, we give "serious consideration" to the
agency's construction of it, so long as that construction is reasonable and consistent with the
statutory language, and this is particularly true when the statute involves complex subject matter
within the agency's area of expertise. See First Am. Title Ins. Co. v. Combs, 258 S.W.3d 627, 632
(Tex. 2008); cf. Rylander v. Fisher Controls Int'l, Inc., 45 S.W.3d 291, 302 (Tex. App.--Austin
2001, no pet.) (courts "do not defer to administrative interpretation in regard to questions which do
not lie within administrative expertise or deal with a nontechnical question of law").

 In interpreting the ISA, a stipulation and agreement approved by the Commission, we
are guided by principles of contract construction. See Cities of Abilene v. Public Util. Comm'n,
146 S.W.3d 742, 747 (Tex. App.--Austin 2004, pet. denied). In construing a written contract, the
primary concern of the court is to ascertain the true intentions of the parties as expressed in the
instrument. J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). We must examine
and consider the entire writing in an effort to harmonize and give effect to all the provisions of the
contract so that none will be rendered meaningless. Id. at 229. No single provision taken alone will
be given controlling effect; rather, all the provisions must be considered with reference to the whole
instrument. Id.

 Whether a contract is ambiguous is a question of law for the court. Id. If a contract
is unambiguous, it can be given a definite or certain legal meaning, and an administrative
interpretation of the contract is not entitled to a presumption of validity. Cities of Abilene,
146 S.W.3d at 748. If, however, a contract is found to be ambiguous, creating a fact issue as to the
parties' intent, we must affirm the agency's interpretation if it is supported by substantial evidence. 
Id.


OPC's appeal

 In its sole issue, OPC argues that the Commission improperly terminated the
merger savings and rate reduction riders. OPC urges that the Commission misconstrued the ISA and
the utilities code in determining that TCC's implementation of new rates under bond constituted the
sort of "change" in TCC"s "base rates" that the ISA contemplated.

 Concerning the merger savings rider, the ISA provided, with respect to TCC's rates
following the sixth year after the merger:


Each individual year's rate reduction will apply for a twelve month period with the
last reduction [i.e., that in year six] continuing to apply in years following the end of
year six until base rates for [TCC] are changed.



Regarding the rate reduction rider after year six, the ISA provided:



The rate reduction rider . . . for such [TCC] will cease upon the effective date of new
base rates for such company established pursuant to Section 36.151 or Section 36.101,
PURA. In the absence of the establishment of new base rates for a [TCC] during the
six year period, the rate reduction rider (Table H-1) . . . will continue to apply in
the years following the end of year six until new base rates for such [TCC] are
established. The supplemental rate reduction rider (Table H-2 of Attachment H) will
remain in effect notwithstanding any base rate proceeding during the six year period
after the effective date of the merger and will continue to apply in the years following
the end of year six until base rates for the [TCC] are changed.



Because TCC's base rates were changed in 2005 as a result of Docket No. 28840, the rate reduction
rider in Table H-1 was terminated, and only the supplemental rate reduction rider, along with the
merger savings rider, remains at issue.

 It is beyond dispute that TCC's implementation of new rates under bond resulted
in its charging base rates to its customers that differed from those it charged previously. This would
seem to be a "change" in "base rates" as those terms are ordinarily understood. In contending that
this change in the base rates TCC was charging is nonetheless not a "change" in TCC's "base rates"
under the ISA, OPC in essence argues that the terms have a technical meaning derived from
the utilities code's provisions governing ratemaking. In OPC's view, a utility's "base rates" are not
"actually changed" under PURA unless and until the Commission approves them by final order--
and temporary or interim rates implemented under bond do not count. However, PURA's text
actually supports a contrary conclusion. 

 Under PURA, a utility, in anticipation of a permanent rate change, may post a bond
and implement temporary rates, subject to refund, pending a final decision in the rate case. Tex. Util.
Code Ann. § 36.110:


 An electric utility may put a changed rate into effect throughout the area in which the
utility sought to change its rates, including an area over which the commission is
exercising appellate or original jurisdiction, by filing a bond with the commission.



Id. § 36.110(a). Undercutting OPC's position is the legislature's use of "changed rate" to describe
the rate being implemented under bond. In other words, according to the plain language of
the statute, a "bonded rate" is a "changed rate." See Tex. Gov't Code Ann. § 311.011 ("[w]ords
and phrases shall be read in context and construed according to the rules of grammar and common
usage"); City of Rockwall, 246 S.W.3d at 625-26.

 OPC, however, attempts to draw a distinction between a utility's putting "a changed
rate into effect" under PURA section 36.110 and changing the rate itself, which, in OPC's view,
doesn't happen until the Commission issues a final order. OPC argues:


 PURA section 36.110 states that a utility "may put a changed rate into effect" by
filing a bond; it does not say that a utility "may change its rates" by filing a bond.
Changing an effective date does not render a rate changed; only the final action of the
regulatory body can do so.


However, OPC's argument that "changing an effective date does not render a rate changed" fails to
account for the legislature's use of the phrase "may put a changed rate into effect," which plainly
contemplates a "changed rate" (past tense, not future) being put into effect.

 We also observe that when bonded rates are implemented, the Commission, in
its final order, trues-up the interim rates with the final rates and makes the final rates effective as
of the date the bonded rates were implemented. See Tex. Util. Code Ann. § 36.110. While the
Commission may ultimately determine the utility's rates to be higher or lower than the temporary
bonded rates charged in the interim, it remains that the utility's rates have been changed as of the
time the bonded rates were implemented. In short, nothing in PURA section 36.110 stands for the
proposition that a "change" of "base rates" cannot occur until the Commission issues a final order. 

 Nor do other portions of PURA support OPC's view that a "change" in "base rates"
means only a change by final Commission order. As TCC points out, PURA provides other means
by which rates can be changed without a Commission final order. For example, if the Commission
fails to act on an application for a rate change within the prescribed time period--within 150 days
of the utility's proposed effective date plus an additional two days for each day the hearing on
the merits exceeds fifteen days--the Commission is considered to have approved the rate change.
Tex. Util. Code Ann. § 36.108(c).

 In sum, there is nothing in the text of the ISA or PURA indicating that a "change" in
TCC's "base rates" requires a change by final Commission order and excludes a change
through implementation of bonded rates. This construction finds further support when considering
the evident purposes of the rate reductions mandated in the ISA and the related provisions for
terminating them. During the period in which they were in effect, the rate reductions
served to ensure that TCC's customers shared in the cost reductions and efficiencies that were
anticipated to result from the AEP-CSW merger. See City of Corpus Christi v. Public Util. Comm'n,
No. 03-06-00585-CV, 2008 Tex. App. LEXIS 1706, at *14 (Tex. App.--Austin Mar. 5, 2008,
no pet.) (mem. op.); Tex. Pub. Util. Comm'n, Application of Central and South West Corporation
and American Electric Power Company, Inc. Regarding Proposed Business Combination,
Docket No. 19265 (Order at 10, 20) (Nov. 18, 1999), available at http://interchange.puc.state.tx.us
(accessed May 24, 2010). At the same time, TCC was allowed to benefit from any merger-related
cost reductions actually achieved beyond those passed on to customers through the rate reductions. 
See Tex. Pub. Util. Comm'n, Application of Central and South West Corporation and American
Electric Power Company, Inc. Regarding Proposed Business Combination, Docket No. 19265
(Order at 10, 20) (Nov. 18, 1999), available at http://interchange.puc.state.tx.us (accessed May 24,
2010). However, by providing that the rate reductions would terminate when TCC "base rates" were
"changed," the ISA contemplated that whatever merger-related cost reductions were actually being
achieved by the time of the ratemaking would be factored into TCC base rates. At that point, TCC's
customers would continue to share in any such costs reductions, albeit indirectly through their
impact on TCC's base rates rather than the specific rate-reduction riders. These underlying purposes
are achieved regardless whether TCC's rates are changed through final Commission order or
bonded rates. While bonded rates are temporary and are trued-up in the final Commission order, it
remains that both rates incorporate any actual merger-related cost savings TCC has realized.

 Alternatively, assuming that the ISA is ambiguous and could also be interpreted as
OPC suggests, substantial evidence supports the Commission's interpretation. See Cities of Abilene,
146 S.W.3d at 748. The evidence submitted before the Commission is consistent with our
construction of the ISA. It includes testimony accompanying the submission of the ISA to the
Commission in Docket No. 19265. As set out by the testimony of David Carpenter, the "net merger
savings rate reduction rider" was to be effective over a six-year period following the effective date
of the merger and was intended to allow for the sharing of net merger savings between customers
and shareholders of the operating companies involved. If base rates were changed during the merger
savings sharing period, the net merger savings would continue to be paid to customers. However,
because base rates would be calculated based on test year data that would reflect actual merger-related cost reductions, an adjustment to the test year data would be calculated to prevent double
payment of net merger-related cost savings to customers. If base rates were changed after the
expiration of the six-year net merger savings sharing period, the net merger savings rate reduction
rider would terminate, and all merger savings would be reflected in rates. Thus, the intent of the
parties to the agreement, as explained by Carpenter, was to ensure that rates be calculated in a
manner such that customers shared in--but did not receive double payment for--merger-related
savings. After year six, a changed base rate would fully reflect merger cost savings, and, to prevent
double payment to the customer, the net merger savings rate reduction rider would terminate.

 The rate change at issue here was initiated after the expiration of the six-year sharing
period. As agreed by the parties, the bonded rates were fully cost-based, reflecting actual merger-related cost reductions. Consistent with the intent that customers not receive double payment
of merger cost savings, the implementation of these changed rates would require a simultaneous
termination of the net merger savings rate reduction rider. Whether the rates were bonded rates or
final approved rates is irrelevant. In either scenario, the intent of the ISA was that, in the event of
a rate change after the six-year period, the changed rates would reflect actual merger savings, and
the net merger savings rate reduction rider would terminate.

 We overrule OPC's issue.


The Cities' appeal

 The Cities present two issues--whether the Commission properly approved
TCC's energy efficiency costs and whether the Commission correctly applied its precedent in
Docket No. 28840 to determine TCC's consolidated tax savings allocation. 

 In their first issue, the Cities argue that TCC cannot recover funds for the purpose
of achieving its energy-efficiency goals if those goals were not actually achieved. PURA
section 39.905 sets out the legislature's energy efficiency mandates. See Act of May 29, 2005,
79th Leg., R.S., ch. 328, § 1, 2005 Tex. Gen. Laws 958, 958 (current version codified at Tex. Util.
Code Ann. § 39.905 (West Supp. 2009)). In section 39.905, the legislature established the goal that
electric utilities reduce Texas customers' energy consumption. Id. (current version at Tex. Util.
Code Ann. § 39.905(a)). To that end, electric utilities are required to administer energy savings
incentive programs by providing incentives "for retail electric providers and competitive energy
service providers to acquire additional cost-effective energy efficiency." Id. (current version at
Tex. Util. Code Ann. § 39.905(a)(3)). At relevant times, this requirement was implemented by the
following Commission rule:

 Funds for achieving the energy efficiency goal will be included in each utility's
transmission and distribution rates.


25 Tex. Reg. 3002 (2000), amended 27 Tex. Reg. 9736 (2002), amended 30 Tex. Reg. 5787 (2005),
repealed 33 Tex. Reg. 3586 (2008) (former 16 Tex. Admin. Code § 25.181) (Pub. Util. Comm'n). 

 It is undisputed that TCC did not meet its January 1, 2006 energy efficiency goal. It
is, likewise, undisputed that the costs in dispute were, indeed, incurred for the purpose of achieving
TCC's energy efficiency goals. The sole dispute here is whether, given that TCC did not actually
meet its energy efficiency goals, costs incurred for that purpose can be included in TCC's rates.

 The Cities' assertion that TCC can recover money spent to achieve its energy
efficiency goal only if it actually achieves that goal finds no support in the plain language of
the Commission rule. The rule contains no requirement that energy efficiency goals actually be
achieved. Contrary to the Cities' assertions, the rule includes no language to the effect that a utility
"must achieve the mandated goals" or that the goal must be "actually achieved." Because the rule
is unambiguous and because its plain language allows for the recovery of funds spent to achieve
energy efficiency goals with no requirement that energy efficiency goals be actually achieved, we
adopt this plain-language interpretation. See Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248,
254 (Tex. 1999).

 Moreover, the Commission's interpretation that the rule allows rates to reflect funds
spent to achieve the energy efficiency goal, regardless of whether the goal was actually met, is
consistent with the rule's plain language and with the statutory framework established in PURA
section 39.905. PURA section 39.905 provides that the required energy savings incentives may be
provided through "market-based standard offer programs or limited, targeted, market-transformation
programs." See Act of May 29, 2005, 79th Leg., R.S., ch. 328, § 1, 2005 Tex. Gen. Laws 958,
958 (current version at Tex. Util. Code Ann. § 39.905(a)(3)). Thus, the statutory framework creates
a situation in which electric utilities are required to provide energy efficiency incentives for
retail electric providers and competitive energy service providers, but ultimately have little control
over the success of these energy efficiency programs.

 Consistent with this statutory framework--a framework in which the success of these
energy efficiency programs is often beyond the control of the electric utilities--the plain language
of the rule imposes no requirement that the energy efficiency goals be met as a prerequisite to
recovering funds. And, consistent with the plain language of the statute and the rule, the
Commission has interpreted the rule to allow rates to reflect funds spent to achieve the energy
efficiency goal, regardless of whether the goal was actually met. We are required to uphold an
agency's interpretation of its own rule where, as here, the agency's interpretation is consistent
with the regulation and is not plainly erroneous. Public Util. Comm'n v. Gulf States Utils. Co.,
809 S.W.2d 201, 207 (Tex. 1991).

 Because the plain language of the rule imposes no requirement that energy efficiency
goals be met as a prerequisite to recovery of funds spent to achieve those goals and because the
Commission's interpretation--also imposing no requirement that the energy efficiency goal be
achieved--is consistent with the goals set out in the statute, we hold that the Commission acted
within its authority in allowing TCC to recover funds spent to achieve the energy efficiency goal,
even though that goal was not actually achieved. Accordingly, we overrule the Cities' first issue.

 In their second issue, the Cities argue that the Commission incorrectly applied
its precedent in Docket No. 28840 to determine TCC's consolidated tax savings allocation. The
Commission found that TCC's recoverable costs should be reduced for tax savings that could have
been realized by filing a consolidated tax return with its affiliated companies. TCC argued that
the adjustment was not required, but offered evidence that, if the Commission determined otherwise,
the proper adjustment was $2.9 million, consistent with the manner with which the Commission
had treated such tax savings in Docket No. 28840. The Cities argue that the Commission did not
correctly follow precedent and that a larger adjustment was required.

 PURA section 36.060 requires that, when setting rates, the Commission consider
potential tax savings available to a utility through the filing of a consolidated return with affiliated
corporations:


 Unless it is shown to the satisfaction of the regulatory authority that it was reasonable
to choose not to consolidate returns, an electric utility's income taxes shall be
computed as though a consolidated return had been filed and the utility had realized
its fair share of the savings resulting from that return if:


 (1) the utility is a member of an affiliated group eligible to file a
consolidated income tax return; and

 

 (2) it is advantageous to the utility to do so.



Tex. Util. Code Ann. § 36.060 (West 2007). An adjustment made to rates under this provision is
referred to as the consolidated tax savings adjustment and is based on the value of the tax shield that
the utility provides to the parent company and its nonregulated affiliates. See City of Corpus Christi, 
2008 Tex. App. LEXIS 1706, at *28; Tex. Pub. Util. Comm'n, Application of AEP Texas
Central Company for Authority to Change Rates, Docket No. 28840 (Order at 38) (Aug. 15, 2005),
available at http://interchange.puc.state.tx.us (accessed May 13, 2010). The legislature has granted
the Commission broad discretion in determining a utility's fair share of the savings arising from
the filing of a consolidated tax return by the parent company. Reliant Energy, Inc. v. Public Util.
Comm'n, 153 S.W.3d 174 (Tex. App.--Austin 2004, pet. denied). 

 Contrary to the Cities' assertions, as supported by the record, the methodology
adopted by the Commission here is consistent with that adopted by the Commission in
Docket No. 28840 and approved by this court in City of Corpus Christi. See City of Corpus Christi,
2008 Tex. App. LEXIS 1706, at *25-30; Tex. Pub. Util. Comm'n, Application of AEP Texas Central
Company for Authority to Change Rates, Docket No. 28840 (Order at 38-39, 57) (Aug. 15, 2005),
available at http://interchange.puc.state.tx.us (accessed May 13, 2010). In Docket No. 28840, TCC's
last rate case, the Commission approved a method of determining the consolidated tax savings
adjustment by which TCC's rate based percentage would be assigned to the transmission and
distribution functions for each of the years prior to 2002 as a means of functionally assigning
consolidated tax savings to the transmission and distribution functions, Tex. Pub. Util. Comm'n,
Application of AEP Texas Central Company for Authority to Change Rates, Docket No. 28840
(Order at 38) (Aug. 15, 2005), available at http://interchange.puc.state.tx.us (accessed May 13,
2010), and this Court affirmed the Commission's determination, City of Corpus Christi, 2008 Tex.
App. LEXIS 1706, at *25-30. Thus, prior to 2002, the percentage of TCC's rate base investment
assigned to the transmission and distribution functions provided a proxy for actual functional
taxable income, as functional taxable income information was unavailable until 2002, when the
electric utility industry was unbundled in Texas.

 Docket No. 28840 also included 2002, however, and in 2002, the first year in which
functional taxable income information was available, instead of determining TCC's allocation of its
consolidated tax savings adjustment to its transmission and distribution functions by means of a
proxy, the Commission used the taxable income information reflected on the functional income tax
returns. See Tex. Pub. Util. Comm'n, Application of AEP Texas Central Company for Authority to
Change Rates, Docket No. 33309 (Proposal for Decision at 159-60) (Aug. 30, 2007), available at
http://interchange.puc.state.tx.us (accessed May 13, 2010). Thus, the Commission's decision in
Docket No. 28840 reflects its determination that when actual functional taxable income information
is available, that information--and not the proxy used in previous years--should be used to
determine TCC's allocation of its consolidated tax savings adjustment to its transmission and
distribution functions.

 Our analysis shows that the Commission's decision to allocate TCC's consolidated
tax savings adjustment to the transmission and distribution functions based on actual functional
transmission and distribution taxable incomes when, as here, that information is available, is
consistent with precedent established in Docket No. 28840 and approved by this court. In light of
Commission precedent, and agreeing with the ALJ's finding that the "use of functional taxable
income is the more logical methodology since the CTS itself is based on taxable income and losses,"
we cannot conclude that the Commission's decision to use functional taxable income to determine
TCC's consolidated tax savings adjustment is arbitrary and capricious. See Tex. Pub. Util. Comm'n,
Application of AEP Texas Central Company for Authority to Change Rates, Docket No. 33309
(Proposal for Decision at 160) (Aug. 30, 2007), available at http://interchange.puc.state.tx.us
(accessed May 13, 2010); Gulf States Utils. Co., 809 S.W.2d at 207 (we reverse Commission
decision as arbitrary and capricious if it fails to follow clear, unambiguous language of its own
regulation).

 The Cities also argue that--even if consistent with Commission precedent--the
Commission's decision here is not supported by substantial evidence. This argument is based on
differences in the allocation of tax savings to transmission and distribution functions in the period
from 1991 through 2002, ranging from eighteen to twenty-four percent, and the period at issue
here--from 2002 through 2005--in which the allocation was less than five percent for each year. 
According to the Cities, the record provides no explanation for the "huge changes in allocations over
the historic period." The Cities, likewise, note the discrepancy between income reported on
tax returns and income reported on FERC Form 1, for which, the Cities argue, TCC offers no
plausible explanation. According to the Cities, these discrepancies exist because 


 with no justification in the record, the Commission vitiated the 'consolidation'
aspects of the adjustment by separating out the T&D [transmission and distribution]
functions, calculating the pro forma tax returns for the T&D functions, and
subtracting this taxable income from the total taxable income[,] . . . assuming that all
the other income was related to the generation function.



The Commission's decision to adopt the consolidated tax savings adjustment proposed by TCC, the
Cities argue, is therefore, not supported by substantial evidence.

 Contrary to the Cities' assertions, however, substantial evidence supports the
Commission's decision. TCC witness Jeffrey Bartsch, Director of Accounting and Regulatory Tax
Support for AEP, testified that the Commission requires TCC to maintain separate functional books
and records, including a general ledger, for its nuclear, generation, securitization, and transmission
and distribution functions. As only legal tax entities are required to report information to the IRS,
much of the information required to determine an entity's taxable income or loss is not included. 
But, as Bartsch testified, these separate functional books and records are used to prepare TCC's
functional income tax return and consolidated income tax return.

 Bartsch further testified that it is a common practice for companies, including TCC,
to use different methods in determining book income and taxable income. Book value or book gains,
which increase taxable income, may not be included in gross revenues for Federal Energy Regulatory
Commission (FERC) reporting purposes, as FERC Form 1 contains book information rather than
taxable information. Specifically, Bartsch explained the discrepancies between income reported on
IRS returns and FERC forms in the years at issue by describing several post-2002 plant sales that
generated taxable gains for the generation function but were not recorded in book gains and,
therefore, not reported on FERC Form 1. In addition, Bartsch explained that the discrepancies
between income reported on FERC Form 1 and IRS tax returns resulted from the fact that
gross revenues are reported on IRS tax returns while net revenues are reported on FERC Form 1. 
In light of the differing manners by which revenues are reported and in light of sales that
significantly increased taxable income but had no effect on book income, Bartsch testified, "it is
completely reasonable that the generation function would have relatively high taxable income for
the years 2002 through 2005 since its plants were either being utilized to generate and sell electricity
or, in 2004 and 2005, they were being sold."

 As explained, under the substantial evidence standard of review, we presume that the
Commission's findings are supported by substantial evidence, and the contestant bears the burden
of proving otherwise. See Southwestern Pub. Serv. Co., 962 S.W.2d at 215. The Cities have not met
their burden of showing that no reasonable basis exists in the record for the agency's action. See
Pend Oreille Oil & Gas Co., 817 S.W.2d at 41. As the Commission's decision to adopt TCC's
proposed allocation methods and the Commission's determination of TCC's consolidated tax savings
allocation are within the bounds of reasonableness, we are required to uphold that decision. See
Southwestern Pub. Serv. Co., 962 S.W.2d at 215. Accordingly, we overrule the Cities' second issue. 


CONCLUSION

 Having overruled each of appellants' issues, we affirm the district court's judgment.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: June 11, 2010